Which is your district? Eastern District, Tennessee. Okay. Morning, ladies and gentlemen. Before we begin this morning, I want to thank the Honorable Curtis Collier from the Eastern District of Tennessee for coming up and leaving his very busy docket and spending some time with us. We are very grateful for the assistance from the District Court judges. Counsel for appellants, if you have reserved or wish you had remembered to reserve time for rebuttal, please tell us that at the outset of your argument because it helps us to keep track as well. You may call the first case. Case number 14, hearing 158. Rayel Waltheer-Willard v. Mariemont City Schools. Oral argument, not guilty, 15 minutes per side. Mr. Welsh-Swearer for the appellant. Your Honor, I would like to reserve five minutes for rebuttal, please. You may. Thank you. May it please the Court, Counsel. This case did receive, in my client's condition, her phobia of children, received some sensational attention and ridicule, frankly, in the press and by members of the administration for appellee. But really, this is a classic employment discrimination case. Involves a situation where there was factual evidence that my client's disability was used against her in a way to constructively discharge her and ultimately replace her with a younger worker. And really, for purposes of this appeal and why we're here, it boils down to basic summary judgment law. And several errors by the court, including repeated occasions where the trial court made factual assumptions that were not in evidence, ignored evidence that created material issues of fact, and repeatedly viewed evidence in the light most favorable to the moving party instead of the non-moving party. And there are several examples of that regarding the Americans with Disabilities claims, for example. The court ignored evidence and viewed it in the light most favorable of the moving party in making a determination that my client did not ask for an accommodation. First of all, there was evidence in the record that since 1997, there was an accommodation in place for my client was not to teach below the high school level. And indeed, that had happened up until she was transferred to the junior high without seeking any input from her. And that was completely ignored. Well, I mean, they eliminated the French teacher position, right? Your Honor, that is correct, they did. And that was another example of, one of the examples, of how the trial court improperly took at full value that justification by the appellee. But let's just start with, it is undisputed, right? That they eliminated- They eliminated live French. Right. And so they didn't have, the position she held was eliminated. And then they transfer her to the middle school, right? That's correct. And obviously, that's part of what you're complaining about. But the ADA does not require the employer to terminate another employee in order to accommodate the person with a disability. And they already had a Spanish teacher, right? Well, actually, they did. They had Mrs. Temerding. Right. But my point was that when the evidence was viewed as a whole, that is certainly one explanation. And the jury should have been allowed to go to the jury to make that determination. But we're talking about my client, who was a native speaker of Spanish. Okay, but- The senior, I'm sorry. I know. Well, just to finish the point, I guess. I mean, it seems like you're running into a hard obstacle in the act here, which is there's no liability if the accommodation would have required the school to displace another employee. And it just doesn't matter about her prior arrangement, or whether it's just you can't get past that. Well, actually- Unless I'm missing something about the facts of the case. I think you are. And in fact, one of the pieces of evidence that was ignored was my client had seen on Marymont's website an advertisement for a Spanish teacher. And she took that to her principal and said, hey, let me stay at high school if you're hiring a Spanish teacher. He said, no, it's already been decided for you. So that is one example of a request for an accommodation that wasn't honored. And again, after she'd been transferred to middle school, she again asked in writing to be transferred back. It was put on hold. And she was constructively discharged for the reasons I discussed. But what we're talking about here is the senior teacher in the district, a native speaker of Spanish, they didn't accommodate her. They didn't even ask her. They didn't even ask her for input at any time. And the evidence as a whole shows that she was moved down. They knew about her disability. They discussed it. They didn't ask her. The court made its own finding that, well, what a younger person was. Well, in fact, there was never any expert testimony of what younger children were. She was transferred to middle school. It caused her distress. There was evidence of her blood pressure. They knew about it. In fact, plenty of the emails that we discussed as evidence of the hostile work environment were ridiculing her, calling her crazy. She would request time off to go to the doctor because of high blood pressure. They would make snide comments about, well, it must have been too much for her. General attitude of hostility and using an example of using her disability, putting her in a situation where she was very uncomfortable, to ultimately, it was a foregone conclusion that this was done. And I asked Dr. Renner, well, did you ever consider, would you consider taking her back to the high school? I don't know. It was never an option. And the totality of all this evidence is something I'm talking about is a trier of fact could look at it and should have been able to look at this and determine what inference they were gonna draw from the evidence, whether they believe the school, that, hey, we reshuffled positions. We didn't really have a place for her. We offered her a position, but she just resigned and we were surprised. Or you could look at the evidence and say, you've got your senior teacher in the district. They don't get any input from her. They know about her disability. They transfer her down to middle school. They know she's having blood pressure issues, know she's having problems. She requested to stay. She requested to come back. And ultimately, she resigns. Even though she had enough sick days, she could have, if she had hoped that there would have been more, she could have used sick time. But instead, they constructively discharged her, temporarily replaced her position with someone who was over 40, but then got rid of them and permanently replaced with a younger person. Well, I mean, on that point, can you cite any authority for the proposition that if an older worker is replaced by another older worker, who is then replaced by a younger worker, that the first older worker can bring suit for an age discrimination claim, even though she wasn't replaced by a younger worker? Is there any case that you can point us to? I'm aware of no case that says that. And I'm also aware, and no case has been brought to my attention, to the contrary. And that's why I believe that this- The statute itself says they have to be replaced by a younger worker, which would seem itself to be to the contrary. Well, that's why I believe it was an issue of fact for the jury to determine the motive. Here, the trial court bought- Why does the motive matter if she wasn't replaced by a younger worker? It matters because there was a temporary replacement used to circumvent the statute. And that is why I believe that that is a factual issue. That the trial fact should listen to all these facts and determine- Is it a fact that when she was replaced, it was mid-year? She was replaced- No, at the beginning- Well, when she was replaced, when she retired, she retired, there were a few months to go. But that's not the worker you're complaining about, the replacement? No, that person, that gentleman was over 50, and then his contract wasn't renewed, and they got rid of him, and then put in a woman in her 20s who was not a native speaker, and less qualified, and earning less money. I believe there's a prima facie case there, and it's not appropriate matters of motive in why things are done. And the case I cited in my brief, that's typically not appropriate for summary adjudication. That's why I believe this should proceed to a jury. The jury should decide what all this means. They could believe the justification provided by appellees, certainly. But you could also draw an equally reasonable inference from the evidence that, well, this really does look like you knew about her disability, broke an accommodation, moved her down there where you knew she'd be uncomfortable, knew she was uncomfortable, didn't accommodate your senior teacher, got rid of her, and replaced her with someone earning less money who's younger. That's another reasonable inference, but it should be up to the trier fact to decide. Counsel, you would like a rule that says that in cases where an employee is replaced by someone that is in the same class, that we should ignore what the statute says, leave it up to a jury to determine whether this is a subterfuge just to get around the statute? You'd like that to be the rule? I don't know that necessarily has to be a rule. I just, I believe that within the factual pattern we have here, the replacement was only here for about a year. Suppose there are two. You have two temporary people. Well, then, I think so. I think it should be a factual issue. You know, I don't know, Your Honor. I'm just saying. Someone outside of the class? I think every case is factually different. And I think when you look at all of the facts here, you can draw certainly more than one reasonable inference from the evidence, and one of them is discrimination. And just briefly, there were also claims we had on a motion to dismiss, on breach of contract. I would submit that there was certainly enough evidence in the record and on those claims that there was an agreement and conduct in accordance with that for over 13 years, and that it was breached, and that. The agreement being? To teach just at high school, not teach below the high school level. You don't say that that was some kind of a written agreement. Well, there was a writing, and it was assigned by everybody now. But there was action in accordance with it. And the writing said? From Attorney Gerhard Stein, my client's attorney, then attorney, to the attorney for the administration, this is the understanding that from this point forward, and I'm paraphrasing, my client is not expected to teach below the high school level. And then 13 years of conduct in accordance with that. Can you tell me where in the record, that wasn't the way I remembered that letter specifically. Can you tell me where in the record that letter is? That letter was attached to several depositions. It was probably, you will find it attached to Emhoff Deposition. Maybe Mr. Renner's deposition. And it may have been even part of my client's deposition as well. Okay, thank you very much. Thank you. Good morning, may I please the court, Ian Smith for Appalachian Marymount. Judge Batchelder, it was the letter from Ms. Willard's counsel, exhibit six, to Ms. Walther's volume one of her deposition. And in that letter, there is a note by her counsel to Mr. Harris. This is after she's already not being required to teach 45 minutes a day to the primary school students. There's a note in which he indicates, my client has indicated that she suffers from a mental disorder that is extremely acerbated when she must work with young children. Her present job assignment poses no problem since she works with teenagers. And then her doctor, Dr. Friedman, with whom she's treated since the early 90s, started off the process by sending a letter to then superintendent Jerry Harris. And she indicates, she being Dr. Friedman, currently Ms. Walther is suffering with an issue of infertility and her desire for a child. This subject produces much distress for Ms. Walther. She has not yet reconciled this issue and remains very upset when around babies or small children. So the issue in 1997 was whether Ms. Walther was physically able to teach an enrichment program to the primary school. She submitted letters from her attorney. She submitted a report from her doctor. And as a result of that, she was not transferred to teach part of her day in the primary school level. At no time during her entire career at Marymount, did she submit any letter or report from a doctor which indicated that she could not teach seventh or eighth graders. The letter to which your opponent refers says that it is his counsel's understanding and hers that she would not be expected to teach below the high school level. Was there any response ever to that? No, there was never a response to that. And since these are, this was a letter dealing with a medical condition, these letters were not exchanged among the faculty from 1997 through 2011. And this is a case where the French program was being phased out. She was notified in February of 2009 that the French program was being phased out, but then she would be assigned one and a half school years from then to bring Spanish to the seventh and eighth graders. They had not had Spanish program in the junior high for almost three decades. So from February of 2009 until she retires, at no time did Ms. Walther ask for an accommodation based on any phobia of children, any medical condition, or to accommodate a disability. Instead, the evidence in the record indicates her enthusiasm for bringing this program to the seventh and eighth grade. She was communicating with her junior high principal for a year and a half before this happened. At no time did she say, I have a phobia and I cannot teach seventh and eighth graders. At no time did she tell the superintendent, I cannot teach seventh and eighth graders. At no time when she taught the fall did she say, I cannot teach seventh and eighth graders. Instead, she talks about the success of her program, the difficulties in that fall because students had had no exposure to this language until she was there with them for the first time as a seventh grader or an eighth grader and bragging about her achievements. So this request that somehow an accommodation was denied, there was no accommodation. And if we really wanted to get rid of her because of her age or disability, there's no evidence of that in the record, then why didn't we get rid of her in 2009 when the students voted with their feet and no longer took French? None of that's in the record, what you just said. What? The idea that the students left, voted with their feet because they didn't like her, if that's your implication? No, I'm indicating the program, not her itself. OK, that seemed to be the implication of that statement. None of that is in the record. So I mean, you're not going to get summary judgment on that representation. Well, the representation, Your Honor, is that the program numbers were dwindling. And as a result of that, they created a new program for her in the junior high, which had not been there for three months. And there was no indication that she could not physically teach this program. And if she truly could not teach this program, then it was up to her. She has the initial burden to request an accommodation, and she did not do so. Even though at the time, she was still treating with Dr. Friedman. And Dr. Friedman could easily have written a note indicating that at this time, it's my professional opinion that she can also not teach seventh and eighth graders. That never happened in this case, and there was no indication that Ms. Walters Willard ever shared any medical conditions or concerns about teaching seventh and eighth graders to the superintendent, who was in charge of transferring teachers between buildings, to her prior building principal, Dr. Renner, or to her then supervisor, Dr. Kaney, with whom she said she got along very well with. She had no disagreements. She retired as a teacher with tenure. No one forced her out of the building. And so even beyond the issue as far as the age discrimination about not being replaced by a younger person, she was not subject to any form of an adverse employment action. She left on her own accord. She left with 35 years of retirement credit. And she left a position working for a principal with whom she got along well and had been in constant communication about her expectations for this new program since February of 2009. As far as the hostile environment claim is concerned, there was no evidence in the record of any disparaging comments regarding Ms. Willard based on her age or disability during these meetings that she had with any of her supervisors. This is a one-time disagreement that she had with Superintendent Imhoff in 2009. At no time did she avail herself of any of the school's harassment procedures, even though she was tested on these and had to sign acknowledgments yearly. He never disciplined her, never had any physical interaction with her. And the only other time since December of 2009 that she had any involvement with the superintendent is when she sent a request. And part of her request was not for a mid-year transfer, but a transfer for the 2011 school year, when she said that she would like to be returned to the high school. Ms. Willard has admitted that when she made that request, she was not asking to be transferred immediately to the high school. She was asking for the next school year. She also testified that at the time the request was made, she understood that staffing decisions, it was too early for staffing decisions, and that those usually took place in the late spring, early summer. There's been no contrary evidence to suggest otherwise. Wasn't there some evidence, though, that perhaps co-workers had made some hostile comments about her? Not based on her disability or age. There were some emails after the fact, when she's already retired, I think that she made mention. I think those are the ones to which you're referring, about the fact that there was an email in which she said that at the graduation, she was flying over in a plane and she could see everybody. But there was no evidence that she wasn't even copied on these emails. So there's no hostile interaction between her and any of her co-workers, any of her supervisors. And in fact, Ms. Willard indicated in her deposition that the only allegedly offensive or hostile interaction that she suffered at Marymount was when she had that meeting with Dr. Imhoff on December 18, 2009. Didn't complain about it to anybody. It didn't result in her suffering any type of monetary damage. And she really had nothing offensive happen to her at that time. So she retired on her own accord. We have no constructive discharge. We have no hostile environment. And we have an employee who taught 35 years at the school, retired on her own accord, and was subjected to no illegal conduct by Marymount. And based on that, we ask for affirmance. Thank you. Thank you, counsel. Thank you, Your Honors. I think that Mr. Smith's argument has kind of helped to further reinforce the point I was trying to make, in that we're talking about issues of facts. And there are many facts and different versions and inferences that can be drawn from them. Sufficiency as to evidence, though, is not a matter for the trial court to decide. And it was improper for the trial court to decide. An example, the encounter with Mr. Imhoff. This is an example where the trial court adopted the moving party's version and ignored my client's version. My client said it was a very heated exchange. He took her into a room, screened at her, spit flew. He threatened to punish her if she ever spoke out again. She left the room, was sick, lived in terror after that. His version, well, it really wasn't that bad. I don't remember it like that. And the court adopted that and ignored my client's version. That's a material issue of fact. But even if you accept her version and you assume that all that did happen, that it's just a one-time event, and that took place in what year? That was probably maybe 07, 09, I'm not sure. And she worked at the school district until 2011? That is correct. But all of the evidence, when viewed in its entirety, we talked about the emails that made fun of her. They called her crazy. And there were email exchanges that occurred while she was there. Was she aware of those emails? She was not at the time. But this is all evidence of an undercurrent of hostility towards her. And she's not aware of it? Well, she may not have been directly aware of it. But clearly, that all How is she indirectly aware of it? Well, because some of those emails were she was called into the office, Maria's update, she's in the bathroom hyperventilating, she's lucky she has a job. She was physically being affected. There was evidence of an undercurrent of hostility here that segues and really provides another explanation as to why. These hostile emails and, again, looking at the evidence of likeliness favorable to your client, assuming that there was some hostility directed toward her by these people. These are co-workers? It would have been administration. But there was also hostility The supervisors? The superintendent and the administrative staff there, Mr. Imhoff and Maggie Kornreich and some others were in the email chain. But the evidence the court overlooked, probably the biggest part of evidence is to a hostile work environment. And that was the fact that transferring her to work around younger children when they knew about her condition. And they knew about it. They discussed it before they transferred her. Did they ask her? No. Did they ask any of the doctors, including their own doctor, that confirmed she had the condition back in 97? No, they didn't. It was a foregone conclusion. And that's what the evidence shows. The court also, for example, made its own findings of what is younger. Well, that's just we're talking about an issue that never even was addressed by the experts. But the accommodation and the agreement, as far as my client understood, was I'm not going to teach below high school. Is there a uniform agreement of what younger means? No, and it was never discussed or part of the conversation. It's one of those red herrings. And the court just said, well, it shouldn't be included because they're not younger. Are we talking about Mr. Price at this point? No, we're talking about what constitutes a younger child. Oh, OK. Being around and working around younger children. The court said, well, on the face, the documents don't preclude her from working with middle school children. Well, the whole context of the prior conversation and the reason she got the accommodation was she was asked to teach in an elementary setting, but it doesn't exclude or provide a certain age range. They're just making an inference. And specifically, at the time she was transferred to teach in the junior high school, did she specifically put the administration on notice that she could not teach these children? She did not. She tried to stay at the high school, but she, from her perspective. She did not put them on notice that her phobia extended to junior high school children. We put her on notice again of the accommodation that was already in place? She put them, as I understand the facts, she made it clear that she could not teach elementary school children, that she had a medical, mental problem. Dealing with children of that age. Is that correct? Well, that was the context. But it was never really discussed in the record and never came out. The experts never discussed what a younger person was. The accommodation, as far as she understood it, was I'm not going to teach below high school. Don't you need some evidence that there was actually concrete explanation to the people you accuse of the discrimination, that she couldn't teach junior high school in order to claim that they were discriminating against her by making her teach junior high school? I'm not aware of any continuing duty to put someone on notice of something they're already on notice of in the existence of an existing accommodation. Thank you, counsel. The case will be submitted. Thank you. Clerk may call the next case.